GREAT BEAR SPRING CO., AND KEEWIS REALTY CO., INC., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10489.   Promulgated June 5, 1928.

*Donald Horne, Esq.,* for the petitioners.

*T. W. Mather, Esq.,* for the respondent.

## OPINION.

Love: Before discussing the issues, we will dispose of two claims made by petitioners in their brief.

The first is, that another company, viz, the Great Bear Water Works Co., was affiliated with them. Testimony intended to prove the fact was offered by petitioners during the taking of a deposition and was duly objected to on behalf of the respondent. There are no allegations in the pleadings relating to it and we are, therefore, precluded from considering this claim.

Second, the petitioners invoke the jurisdiction of the Board to redetermine the tax of the Spring Company for 1920. It is asserted in the brief that the amount of overassessment of this company, mentioned in the deficiency letter, is the disallowed portion of a larger amount as to which a claim in abatement had been filed. However, the facts are not pleaded and are not in evidence and there is, therefore, nothing before us upon which we may act. The only reference to an abatement claim is a sentence in the deficiency letter, reading, " Consideration has been given the statements contained in your claim for the abatement of $3,648.60, 1920 income and profits tax." On its face, the deficiency letter states merely an overassessment of the Spring Company for 1920. This is the only fact before us, and we have no jurisdiction to redetermine an overassessment.

The consolidated tax assessed against the two petitioners was apportioned by the Commissioner between them on the basis of the income assignable to each. Section 240, Revenue Act of 1918. In redetermining the deficiency of the Realty Company for 1920 and of the Spring Company for 1921, it is necessary to consider any evidence

affecting the consolidated tax, but we have no jurisdiction to redetermine the tax liability of the member of the affiliation against which no deficiency has been determined.

It is alleged that the petitioners were on the accrual basis of accounting and that their income and invested capital should be computed accordingly, the Commissioner apparently having used the cash receipts and disbursements method. The testimony consists largely of accounting figures read into the record, and exhibits consisting of sheets from accounting books. These do not, however, tell the story completely. Such argument as was made throws no light on how the petitioners themselves interpreted this testimony in reaching their conclusion that the accrual method prevailed. They maintain that the Spring Company had accounts receivable in 1920, which were summarized on its general books, although the details were kept in the auxiliary ledgers at the branches; also that it kept inventories, and that the existence of accounts receivable and inventories are consistent only with the accrual method. They stop short, however, of showing just how the accounts receivable were treated in computing income. The balance sheets indicate that they were not included in income in 1919 and 1920; otherwise, they would appear therein as assets and be reflected in surplus. The surplus appearing in these balance sheets, respectively, checks with the profit and loss accounts in the books. This shows that the accounts receivable undoubtedly were not considered in computing income. Its so-called inventory was not a record of goods or materials in stock used in manufacture. It had no "stock in trade" in the ordinary accounting sense. The article which it dealt in was water, and the water was not inventoried. What it terms an inventory was a statement of the personal property which it owned at each branch office such as machinery, furniture, bottles, crates, horses, automobiles, coolers, and of the accounts receivable. The testimony introduced by petitioner not only fails to prove that the Spring Company was on the accrual basis in 1920, but, on the contrary, shows, we think, that its books were then kept on the cash receipts and disbursements method.

This conclusion is supported by the fact that it made entries in 1921 putting the accounts receivable on the general ledger and including them in surplus for the first time. Under date of January 1, 1921, it made an entry in the profit and loss account, reading, "Additional assets not earnings, $86,686.70." Reference to another page shows this item to be made up as follows: "Supplies, $2,877.07; Coolers, $38,444; Accounts Receivable, $45,365.63." The evidence shows that the accounts were kept on the accrual basis in 1921, and we think this method would correctly reflect its income for 1921.

The only evidence as to how the Realty Company kept its books is a copy of its profit and loss account. This account does not contain enough information to enable us to determine the question and we make no finding in this regard.

Petitioners contend, however, that accounts receivable should properly be included in invested capital irrespective of the accounting method employed, since they are assets and tangible, and, as they state, represent an investment of cash. They cite section 325 of the Revenue Act of 1918. This is a section of definitions. Section 326 is the one that prescribes what may be included in invested capital. Assets, merely as such, are not included. Invested capital embraces cash and property paid in for stock, or as paid-in surplus, and also earned surplus and undivided profits. Under the cash receipts and disbursements method of accounting, accounts receivable do not enter into earned surplus or undivided profits until after they have been collected. We, therefore, hold that the accounts receivable of the Spring Company are not a part of invested capital for 1920, but that the accounts receivable at the beginning of 1921 may be included in invested capital for 1921.

The Spring Company charged coolers to expense. They had a life in service of 10 years, and are properly capital assets. At the beginning of 1920 it had thus expended for coolers, $98,643.31. The accrued depreciation thereon was $47,791.95, leaving an unexpired value of $50,851.36. At the beginning of 1921 the total expenditure was $105,995.89; accrued depreciation $58,023.88; unexpired value $47,972.91. However, inventories at the beginning of 1920 and 1921 show that this company had on hand coolers of the value of $38,100 and $38,444, respectively. The discrepancy between the inventories and the unexpired part of the cost at the beginning of each year is not explained. If the difference represented coolers lost or destroyed, deductions should have been made in the year in which the loss or destruction occurred. The total cost of coolers should be reduced by the amount of the discrepancy, both for invested capital and for depreciation purposes.

It is proper to include in invested capital the supplies on hand at the beginning of each of the taxable years, which had been charged to expenses.

The parties have agreed upon the amount of depreciation to be allowed on part of the property of the Spring Company. In addition to the amounts agreed upon, petitioners claim obsolescence on a building and machinery located on leased ground at Jersey City which had been used as a bottling plant. The purchase of springs at a different location, from which delivery of water would be made directly, rendered this plant no longer of use. In 1920 it was planned to put

the springs into use in about three years, and the change was actually carried out in 1923. One-fourth of the depreciated value is a proper deduction for obsolescence in each of the years 1920 and 1921. In arriving at the amount upon which to compute obsolescence, allowance should be made for the machinery salvaged, amounting to $500. Also, the Spring Company is entitled to deduct in 1920 obsolescence for the machinery which was abandoned when it closed its Harlem plant. The Brooklyn plant was closed in 1918, but the machinery was carried on its books until 1920, when it was given away as being worthless. The petitioners seek to deduct its value in 1920 as obsolescence. The evidence indicates that this machinery, while set aside in 1918, was not discarded until 1920, when it was decided to be worthless. Petitioners are entitled to deduct the depreciated cost of that machinery in 1920.

The petitioners also claim a deduction for obsolescence of horses, wagons, harness, etc., based upon their knowledge in 1920 that they would have to use automobiles instead when the new springs at Morsemere and Shawmont were put into use. We do not think it can be maintained that in 1920 horses and their appurtenant equipment had become obsolete in commercial use. It is undoubtedly true that their employment in trade and commerce had been increasingly curtailed, but we think that we may judicially notice the fact that they had a market value in 1920, with the prospect in that year that they would continue to have a value in 1923 when the Spring Company expected to discontinue their use. There is no testimony as to how they were disposed of or what was realized from them. To entitle the petitioners to this deduction, they would have to show that it was known in 1920 that horses and the equipment that goes with them would be obsolete and have no value (except as scrap) by the time its plans for substitution of automobiles were carried out. This they have failed to do.

The testimony shows the automobiles had a life in the Spring Company's service of four years, and depreciation thereon on this basis should be allowed.

The remaining question relates to the allowance of depreciation to the Realty Company on buildings. These buildings were all acquired from the Spring Company on March 1, 1918. The basis for determining depreciation is the cost, there being no provision in the 1918 Revenue Act for a different basis in a case like the present one. The Realty Company gave for all the property, embracing land and buildings, its entire capital stock of the par value of $225,000. We have no evidence of the value of the stock, but we may presume that it had no value prior to the exchange, since there were no assets back of it; and that after the exchange its value was substantially the same as the value of the property acquired. This value does not

appear. We have in evidence the total cost of each building to March 1, 1913, without any deduction therefrom for depreciation; and a book value to the Spring Company on March 1, 1918, representing balances after the deduction from the several cost figures of certain amounts for depreciation, which do not appear to have been arrived at according to a consistent method or plan. These figures are of no aid in determining the value March 1, 1918, and we, therefore, do not disturb the allowance for depreciation made by the Commissioner.

*Judgment will be entered under Rule 50.*